**In re Wallace E. KENISTON, Debtor.**

**Bankruptcy No. 85–0075.**

United States Bankruptcy Court,
D. New Hampshire.

March 31, 1988.

Frederic Cox, Wolfeboro, N.H., for Deborah Keniston.

Erland McLetchie, Ossipee, N.H., for debtor.

Diane Puckhaber, Concord, N.H., trustee.

Elizabeth T. Luster, Daniel Sklar, Manchester, N.H., Frank Salinger, Washington, D.C., amicus counsel.

Gregory A. Harrison, Dept. of Justice, Washington, D.C., for U.S. Atty.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This case is before the court upon a *sua sponte* motion by the court under § 707(b) of the Bankruptcy Code questioning whether this case should not be dismissed as a "substantial abuse" of chapter 7 of the Code. The court previously took evidence on the question but before rendering a decision noted the possibility of the constitutional invalidity of the statute in question and directed further briefing and hearing on the constitutional question. *See In re Keniston*, 60 B.R. 742 (Bankr.D.N.H.1986).

The United States, acting through the attorney general, moved to intervene to defend the validity of the statute. This motion was granted and the attorney general has filed a brief on the constitutional questions and appeared at oral argument on the same. The American Financial Services Association ("AFSA") also filed a Motion For Leave To File An *Amicus Curiae* brief in support of the constitutionality of the statute and that motion was granted and the brief was filed. AFSA was heard in oral argument as well. AFSA is the nation's largest trade association serving the consumer credit industry.

In addition, the court ordered appointment of *amicus* counsel for the debtor on the constitutional issues at the debtor's request. The attorneys appointed, Sheehan, Phinney, Bass & Green, Esquires of Manchester, New Hampshire, also filed a brief and were heard in oral argument on the constitutional questions.

The court is indebted to all parties who have filed briefs on the constitutional questions for the responsiveness and completeness of the research displayed in the briefs. The briefs have been of great aid to the court in gaining a fair understanding of the constitutional questions posed by § 707(b) of the Code. As it happens, while the court concludes that a substantial constitutional question of equal protection of the laws is presented, by certain readings of the statutory provision, the court finds as indicated below that a permissible statutory construction, in view of the ambiguous language of the statute and its legislative history, avoids the necessity of reaching that constitutional question in the present case.

## THE CONSTITUTIONAL QUESTIONS

The statutory provision in question was added to the Code by the Bankruptcy

Amendments and Federal Judgeship Act of 1984, Public Law No. 98–353, 98 Stat. 333 (codified as amended in scattered sections of 11 U.S.C. and 28 U.S.C.). Subtitle A of Title III of Public Law No. 98–353 is entitled the "Consumer Credit Amendments" and includes among a number of other statutory changes the new provisions of § 707(b) added to the Code. As enacted in 1984 § 707(b) provided:

> After notice and a hearing, the court, on its own motion and not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.[1]

The reference to "this chapter in the section refers to chapter 7 of the Bankruptcy Code, which deals with what is commonly referred to as "straight bankruptcy" as opposed to a reorganization under chapter 11 of the Code or a voluntary repayment plan under chapter 13 of the Code.

The court posed a number of constitutional questions raised by this statutory provision in its 1986 Opinion. From the briefing and oral argument, I am satisfied that except for the equal protection question discussed below the other constitutional issues raised are not substantial in nature and raise no serious question of constitutional invalidity. The questions as to the vagueness of the statute, and the possible denial of due process by having the bankruptcy judge institute the dismissal proceeding, have been considered recently by the Court of Appeals for the Ninth Circuit and have been answered in favor of consti-

tutional validity. *In re Kelly*, 841 F.2d 908 (9th Cir.1988). The discussion in *Kelly* on these questions is persuasive and I adopt the same here.

The United States' brief and the AFSA brief in the present case also persuasively argue that the dismissal of the case on the Judge's own motion pursuant to § 707(b) is not an uncommon exercise of judicial authority, and note the well-established exercise of such power in dismissing bankruptcy petitions *sua sponte* for lack of good faith. *See, e.g., In re Coastal Cable T.V., Inc.*, 709 F.2d 762, 43 B.R. 770 (1st Cir. 1983); *Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, (1st Cir.1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986); *In re Harvey Probber, Inc.*, 44 B.R. 647 (Bankr. Mass.1984); *Furness v. Lilienfield*, 35 B.R. 1006 (D.Md.1983).

Likewise, I agree that no "case or controversy" lack of federal jurisdiction, pursuant to Article III, Section 2, Clause I of the Constitution, is presented by § 707(b) simply because it authorizes a bankruptcy judge to initiate the substantial abuse question. The § 707(b) issue is raised *within* the basic bankruptcy case which itself constitutes the necessary case or controversy under Article III of the Constitution. *Cf. In re Penn Central Transportation Co.*, 384 F.Supp. 895, 911 (Special App.Ct.1974). As is noted in the United States and AFSA briefs, bankruptcy judges have often used the device of an analogous "order to show cause" to police questions relating to the administration of estates under their jurisdiction. Such power is necessary to the exercise of that jurisdiction and has not been constitutionally questioned.[2]

---

**1.** By Act of October 27, 1986, P.L. 99–554, the first sentence of § 707(b) was amended to permit the U.S. Trustee to raise the dismissal issue, viz., "After notice and a hearing, the court, on its own motion <u>or on a motion by the United States trustee, but</u> not at the request...." [underlined language added]

**2.** The AFSA brief also notes that such *sua sponte* action "is a manifestation of the same inherent judicial power of a judge to impose sanctions *sua sponte* in a frivolous suit under Rule 11 of

the Federal Rules of Civil Procedure.... Similarly, where a court acts to enforce its own rulings by means of criminal contempt, courts are authorized to use their contempt power *sua sponte*. E.g., *United States v. A.T. & T.*, 552 F.Supp. 131, 317 (D.D.C.1982), *affirmed, Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Significantly, the constitutionality of the federal contempt statute was recently upheld against assertions that it was invalid because it provides no set guidelines

The only constitutional question remaining regarding § 707(b) which bears discussion is the question of whether that statute violates equal protection guarantees through its alleged unjustified discriminatory treatment by Congress in dealing with persons and classes affected by its legislative enactment. While the equal protection guarantee appears only in the Fourteenth Amendment dealing with state action, it is now well settled that equal protection guarantees apply to Congressional action as well through the due process clause of the Fifth Amendment. *See, e.g., Mathews v. DeCastro,* 429 U.S. 181, 182 n. 1, 97 S.Ct. 431, 432 n. 1, 50 L.Ed.2d 389 (1976); *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976); *Weinberger v. Salfi,* 422 U.S. 749, 768–770, 95 S.Ct. 2457, 2468–69, 45 L.Ed.2d 522 (1975).

The equal protection question with regard to § 707(b) is raised primarily because almost all of the case decisions construing this statute have read the provision to require dismissal as a substantial abuse of chapter 7 if the individual debtor involved has the ability to repay from future income the debts for which a chapter 7 discharge is sought. *See, e.g., In re Walton,* 69 B.R. 150, 154 (E.D.Mo.1986); *Matter of Cord,* 68 B.R. 5, 7 (Bankr.W.D.Mo.1986); *In re Gaukler,* 63 B.R. 224, 225 (Bankr.N.D. 1986); *In re Kress,* 57 B.R. 874, 878 (Bankr.D.N.D.1985); *In re Hudson,* 56 B.R. 415, 419 (Bankr.N.D.Ohio 1985); *In re Bell,* 56 B.R. 637, 641, *vacated,* 65 B.R. 575 (Bankr.E.D.Mich.1986); *In re Kelly,* 57 B.R. 536 (Bankr.Ariz.1986), *aff'd in effect,* 841 F.2d. 908 (9th Cir.1988); *In re Grant,* 51 B.R. 385, 391 (Bankr.N.D.Ohio 1985); *In re Edwards,* 50 B.R. 933, 936–37 (Bankr.S. D.N.Y.1985); *In re White,* 49 B.R. 869, 874 (Bankr.W.D.N.C.1985). *See also* 4 *Collier on Bankruptcy* ¶ 707.07 at 707–19 (15th ed. 1988).

There is no question that Congress could have conditioned entitlement to chapter 7 discharge relief for *all* debtors who have a demonstrable ability to repay some or all of their debts within a reasonable time. It is established that there is no constitutional right to a bankruptcy discharge. *United States v. Kras,* 409 U.S. 434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973). The constitutional question is raised here only because § 707(b) singles out for this restriction upon the right to a chapter 7 discharge only those individual debtors "whose debts are primarily consumer debts...." More specifically, the possible denial of equal protection stems from the fact that under the reported decisions construing the statute *only* debtors having such debts are required to show that they are not "abusing" the chapter because they *need* chapter 7 relief, i.e., that they do not have the ability to repay their debts out of future income.

No logical reason appears evident, if § 707(b) is truly designed to deal with "abuse" of chapter 7 in terms of the debtors seeking a chapter 7 discharge when they have the ability to repay their debts, as to why such dismissal for "abuse" defined in those terms should not apply to all individual debtors seeking chapter 7 relief. Even when pressed at oral argument neither the United States nor AFSA could give this court any logical reason as to why only consumer debtors should be singled out for the disqualification. It cannot be that Congress wanted to avoid logistical, staffing, or enforcement problems by only attacking a small portion of the bankruptcy court's caseload in this area, inasmuch as consumer cases are by far the great majority of the cases filed in the bankruptcy courts.[3]

---

for the court's discretion. *United States v. Martinez,* 686 F.2d 334 (5th Cir.1982). The Court found no violation of due process and held that statutory limitations on the contempt power are not constitutionally required."

**3.** Statistical Table F–2 in the "Annual Report of the Director of the Administrative Office of the U.S. Courts for 1987", U.S. Government Printing Office, indicates that in the fiscal year ending June 30, 1987 out of a total of 397,548 chapter 7 petitions filed only 51,570 were business bankruptcies. This indicates 87 percent of all chapter 7 filings involved nonbusiness debtors. While the "nonbusiness" category for Table F–2 purposes does not equate directly to "debtors having primarily consumer debts" the correlation is quite close in the experience of the undersigned judge.

Congress provided no definition of "substantial abuse" when adding § 707(b) to the Bankruptcy Code. Resorting to a dictionary definition therefore we find that the term "abuse" has been defined as follows:

> "To make excessive or improper use of a thing, or to employ it in a manner contrary to the natural or legal rules for its use. To make an extravagant or excessive use, as to abuse one's authority." *Black's Law Dictionary* 11 (5th ed. 1979)

Taking that as the definition of abuse the court is presented with the perplexing modifier "substantial" used by Congress in the statute in question. It is inconceivable that by this modifier Congress intended a *degree of abuse* concept. Abuse is abuse in normal parlance and it is beyond the dignity of this court, as well as the dignity of Congress, to suppose that § 707(b) should be interpreted in a manner in which this court would find that chapter 7 was abused by a particular debtor but the case would not be dismissed because the abuse was not substantial enough in degree.

■ It has been suggested that "substantial" as used in § 707(b) simply means that the abuse must be real, and not seeming or imaginary. *In re Edwards*, 50 B.R. 933, 936 (Bankr.S.D.N.Y.1985). This is probably the only defensible reading of the word "substantial" in § 707(b), but that reading itself adds very little to understanding and interpreting the statute, since it should also go without saying that no court would dismiss a chapter 7 petition under the statute for an imaginary abuse. I therefore conclude that § 707(b) should be read as simply providing for dismissal of a chapter 7 petition when the court determines that an abuse in fact is involved.

The concept of equal protection is a fundamental guarantee available under our form of constitutional government. As noted by Professor Tribe in his treatise, *American Constitutional Law*, § 16–1, at 991 (1978):

> But the ideal of equality expresses aspirations so basic as to demand major attention on its own terms. Indeed, the notion that equal justice under law may serve as indirect guardian of virtually all constitutional values is evidenced by more than a maxim carved in marble on the United States Supreme Court.

Professor Tribe then goes on to deal with "underinclusiveness" as one form of denial of equal protection, in § 16–4, at 997 of his treatise:

> "Underinclusiveness" is one such variant of approximation which the Court may invalidate as too arbitrarily departing from "mathematical nicety." Underinclusive classifications do not include all who are similarly situated with respect to a rule, and thereby burden less than would be logical to achieve the intended government end.

Professor Tribe notes that generally courts will defer to legislative judgment on classifications, even in the case of underinclusiveness, but that there is more danger of politically arbitrary action in the case of underinclusiveness, as opposed to overinclusiveness:

> On the other hand, the ordinary judicial tolerance of underinclusiveness may well invite legislatures to avoid the full political consequences of their actions, for "nothing opens the door to arbitrary action so effectively as to allow ... officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected." *Railway Express, Inc. v. New York*, 336 U.S. 106, 112–13 [69 S.Ct. 463, 466–67, 93 L.Ed. 533] (1949). Even the flexibility promoted by attributing several purposes to a law or rule must have some limits. The exemption invalidated in *Smith v. Cahoon*, 283 U.S. 553 [51 S.Ct. 582, 75 L.Ed. 1264] (1931), of "any transportation company engaged exclusively in the transporting [of] agricultural, horticultural, dairy or other farm products and ... fish" from a state regulation of transportation companies, for example, could have been rationalized as blending the double purposes of encouraging traffic safety and subsidizing agricultural production. Yet the Court, declining to test the classification by all conceivable pur-

poses, found "not ... the slightest justification" for an agricultural exemption from a statute "designed to safeguard the public with respect to the use of the highways." *Id.*, at 557, 567 [51 S.Ct. at 583, 587]. The Court may have been influenced in this decision by a suspicion of legislation providing no "notice" to those whom the rule could have been expected to concern; such legislation could only increase the obstacles to public participation in the political process, and therefore detract from the possibility for legislative accountability. [Tribe, *supra*, at 998]

█ It is clear that the classification involved in § 707(b) of the Bankruptcy Code involves socioeconomic regulation and does not involve any "suspect class" requiring heightened judicial scrutiny in application of the equal protection guarantee. As such the statute should be judged only on the basis of the "rational basis" test. *See, e.g., Lyng v. Castillo*, 477 U.S. 635, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986). The problem, however, is that the Supreme Court has spoken in inconsistent language, with two separate lines of decision, as to just how strictly the rational basis test will be applied by the courts.

On the one hand the Supreme Court, in 1911, in language often cited thereafter, spoke in terms of great deference to the legislative judgment on classification questions when an enactment is challenged on equal protection grounds. In the case of *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 [31 S.Ct. 337, 340, 55 L.Ed. 369] (1911) the court expressed the rational basis test as follows:

The rules by which this contention must be tested, as is shown by repeated decisions of this court, are these: 1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary.

However, nine years later the Supreme Court expressed the rational basis test in much less deferential language to the legislature in its opinion in *Royster Guano Co. v. Virginia*, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920), as follows:

It is unnecessary to say that the "equal protection of the laws" required by the Fourteenth Amendment does not prevent the States from resorting to classification for the purposes of legislation. Numerous and familiar decisions of this court establish that they have a wide range of discretion in that regard. But the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.

This schism in the Supreme Court's view of the appropriate standard for the rational basis test has continued down to the present, as indicated in the contrasting recent decisions of the court in *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980), *reh'g denied*, 450 U.S. 960, 107 S.Ct. 1421, 67 L.Ed.2d 385 (1981), and in *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786, *reh'g denied*, 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982).

The court in the *Fritz* case upheld against an equal protection attack a provision of the Railroad Retirement Act of 1974 that excluded certain classes of employees from windfall benefits provided under that statute. The majority opinion in *Fritz* notes the past inconsistency in the deci-

sions, in applying a deferential or less deferential meaning to the rational basis test, and then states its view as to the appropriate standard following the *Lindsley* line of decisions:

Despite the narrowness of the issue, this Court in earlier cases has not been altogether consistent in its pronouncements in this area. In *Lindsley v. Natural Carbonic Gas Co.*, 220 US 61, 78–79, 55 L Ed 369, 31 S Ct 337 [340] (1911), the Court said that "[w]hen the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time that the law was enacted must be assumed." On the other hand, only nine years later in *F.S. Royster Guano Co. v. Virginia*, 253 US 412, 415, 64 L Ed 989, 40 S Ct 560 [562] (1920), the Court said that for a classification to be valid under the Equal Protection Clause of the Fourteenth [449 U.S. 175, 101 S.Ct. 459] Amendment it "must rest upon some ground of difference having a fair and substantial relation to the object of the legislation...."

In more recent years, however, the Court in cases involving social and economic benefits has consistently refused to invalidate on equal protection grounds legislation which it simply deemed unwise or unartfully drawn.

Thus in *Dandridge v. Williams*, 397 US 471, 485–486, 25 L Ed 2d 491, 90 S Ct 1153 [1161–62] (1970), the Court rejected a claim that Maryland welfare legislation violated the Equal Protection Clause of the Fourteenth Amendment. It said:

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley v. Natural Carbonic Gas Co.*, 220 US 61, 78 [55 L Ed 369, 31 S Ct 337, 340]. 'The problems

of government are practical ones and may justify, if they do not require, rough accommodations—illogical it may be, and unscientific.' *Metropolis Theatre Co. v. City of Chicago*, 228 US 61, 68–70, [57 L.Ed. 730, 33 S Ct 441, 443]....

..."[The rational-basis standard] is true to the principle that the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy."

Of like tenor are *Vance v. Bradley, supra* [440 U.S. 93] at 97, 59 L Ed 2d 171, 99 S Ct 939 [at 942–43] and *New Orleans v. Dukes*, 427 US 297, 303, 49 L Ed 2d 511, 96 S Ct 2513 [2516] (1976). Earlier, in *Flemming v. Nestor, supra* [363 U.S. 603] at 611, 4 L Ed 2d 1435, 80 S Ct 1367 [at 1373], the Court upheld the constitutionality of a social security eligibility provision, saying:

"[I]t is not within our authority to determine whether the Congressional judgment expressed in that Section is sound or equitable, or whether it comports well or ill with purposes of the Act.... The answer to such inquiries must come from Congress, not the courts. Our concern here, as often, is with power, not with wisdom." [449 U.S. at pp. 174–176, 101 S.Ct. at pp. 459–60]

Notwithstanding the comments by the majority in the *Fritz* case quoted above, a different majority only two years later relied heavily on the less deferential standard, applying the rational basis test in *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786, *reh'g denied*, 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982), in holding that a Texas statute which withheld funds from local school districts for education of children not legally admitted into the United States violated the equal protection clause. The majority in the *Plyler* case relied specifically upon the rational basis standard enunciated in the *Royster Guano* case:

The Equal Protection Clause directs that "all persons similarly circumstanced

shall be treated alike." *F.S. Royster Guano Co. v. Virginia,* 253 US 412, 415, 64 L Ed 989, 40 S Ct 560 [562] (1920). But so too, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas,* 310 US 141, 147, 84 L Ed 1124, 60 S Ct 879 [882] (1940). The initial discretion to determine what is "different" and what is "the same" resides in the legislatures of the States. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.

\* \* \* \* \* \*

These well-settled principles allow us to determine the proper level of deference to be afforded § 21.031. Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a "constitutional irrelevancy." Nor is education a fundamental right; a State need not justify by compelling necessity every variation in the manner in which education is provided to its population.... But more is involved in these cases than the abstract question whether § 21.031 discriminates against a suspect class, or whether education is a fundamental right. Section 21.031 imposes a lifetime hardship on a discrete class of children not accountable for their disabling status.... In determining the rationality of § 21.031, we may appropriately take into account its costs to the Nation and to the innocent children who are its victims. In light of these countervailing costs, the discrimination contained in § 21.031 can hardly be considered rational unless it furthers some substantial goal of the State. [457 U.S. at pp. 216, 223–224, 102 S.Ct. at 2394, 2398]

The majority opinion in the *Fritz* case itself recognized the unsettled state of the law between the warring interpretations of the rational basis test in an extraordinarily candid footnote on the issue:

This opinion and Justice Brennan's dissent cite a number of equal protection cases including *Lindsley v Natural Carbonic Gas Co.,* 220 US 61, 55 L Ed 369, 31 S Ct 337 (1911); *F.S. Royster Guano Co. v Virginia,* 253 US 412, 64 L Ed 989, 40 S Ct 560 (1920); *Morey v Doud,* 354 US 457, 1 L Ed 2d 1485, 77 S Ct 1344 (1957); *Flemming v Nestor,* 363 US 603, 4 L Ed 2d 1435, 80 S Ct 1367 (1960); *Massachusetts Board of Retirement v Murgia,* 427 US 307, 49 L Ed 2d 520, 96 S Ct 2562 (1976); *New Orleans v Dukes,* 427 US 297, 49 L Ed 2d 511, 96 S Ct 2513 (1976); *Johnson v Robison,* 415 US 361, 39 L Ed 2d 389, 94 S Ct 1160 (1974); *U.S. Dept. of Agriculture v Moreno,* 413 US 528, 37 L Ed 2d 782, 93 S Ct 2821 (1973); *U.S. Dept. of Agriculture v Murry,* 413 US 508, 37 L Ed 2d 767, 93 S Ct 2832 (1973); *Weinberger v Wiesenfeld,* 420 US 636, 43 L Ed 2d 514, 95 S Ct 1225 (1975); and *James v Strange,* 407 US 128, 32 L Ed 2d 600, 92 S Ct 2027 (1972). *The most arrogant legal scholar would not claim that all of these cases applied a uniform or consistent test under equal protection principles. And realistically speaking, we can be no more certain that this opinion will remain undisturbed than were those who joined the opinion in Lindsley, supra, Royster Guano Co., supra or any of the other cases referred to in this opinion and in the dissenting opinion.* But like our predecessors and our successors, we are obliged to apply the equal protection component of the Fifth Amendment as we believe the Constitution requires and in so doing we have no hesitation in asserting, contrary to the dissent, that where social or economic regulations are involved *Dandridge v Williams,* 397 US 471, 25 L Ed 2d 491, 90 S Ct 1153 (1970), and *Jefferson v Hackney,* 406 US 535, 32

L Ed 2d 285, 92 S Ct 1724 (1972), together with this case, state the proper application of the test. The comments in the dissenting opinion about the proper cases for which to look for the correct statement of the equal protection rational-basis standard, and about which cases limit earlier cases, are just that; comments in a dissenting opinion. [emphasis supplied] [449 U.S. at p. 176, 101 S.Ct. at p. 460]

It seems fair to conclude that there *are* two warring lines of decision in the United States Supreme Court as to the degree of deference owing the legislature by the court in applying the rational basis test for equal protection purposes. Notwithstanding the commentary in the *Fritz* opinion the Supreme Court has before and after that decision struck down underinclusive classifications (in cases involving socioeconomic statutes that amounted to arbitrary discrimination by the legislature) under the less deferential "fair and substantial relation" standard first set forth in the *Royster Guano* decision. See *City of Cleburne Texas v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (zoning ordinance excluding group home for mentally retarded invalid as lacking any rational basis as a special threat to City's legitimate interests); *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786, *reh'g denied*, 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982) (decision discussed above); *U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (statute denying food stamps to needy members of groups whose members were not all related to each other created an irrational classification and is invalid); *Lindsey v. Normet*, 405 U.S. 56, 74–79, 92 S.Ct. 862, 874–77, 31 L.Ed.2d 36 (1972) (double-bond requirement when appealing tenant eviction order); *Rinaldi v. Yeager*, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed 2d 577 (1966) (statute requiring only *confined* convicted persons to reimburse for cost of appeal transcript invalid as an "invidious discrimination" with no rational basis); *Smith v. Cahoon*, 283 U.S. 553, 51 S.Ct. 582, 75 L.Ed. 1264 (1931) (state public safety statute requiring operators of motor vehicles for hire to furnish a bond or insurance policy for protection of the public against accidental injuries which excludes those engaged in transporting agricultural, horticultural, dairy or other farm products invalid under equal protection clause). *Cf. also Galioto v. Department of Treasury*, 602 F.Supp. 682 (D.N.J.1985) (statute treating former mental patients differently than ex-convicts with regard to firearm permits "without any logical justification for doing so" offends equal protection clause), *vacated as moot, Department of Treasury v. Galioto*, 477 U.S. 556, 106 S.Ct. 2683, 91 L.Ed.2d 459 (1986).

On the other hand the Supreme Court before and after the *Fritz* decision has also upheld the constitutionality of socioeconomic legislation under a deferential rational basis standard phrased in terms of the "any state of facts" and "without mathematical nicety" standard first enunciated in the *Lindsley* decision. See *Lyng v. Castillo*, 477 U.S. 635, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986) (statutory distinction between parents, children and siblings, as opposed to all other groups of individuals, for food stamp entitlement does not violate equal protection clause); *Bowen v. Owens*, 476 U.S. 340, 106 S.Ct. 1881, 1886, 90 L.Ed.2d 316 (1986) (Social Security Act provision authorizing survivor's benefits to a wage earner's widowed spouse who *remarried* after age 60 but not to a similarly situated *divorced* widowed spouse is valid.... Congress not required to take "an all-or-nothing approach"); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (see discussion in *Fritz* opinion quoted above); *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955) (statute prohibiting licensed optometrist to fit lenses or replace lenses without prescription while exempting sellers of ready-to-wear glasses does not violate equal protection clause) (legislature "may take one step at a time addressing itself to the phase of the problem which seems most acute to the legislative mind").[4]

---

**4.** Justice Stevens has consistently taken the position that the inconsistencies in the Supreme Court's application of the equal protection clause under the "tiered approach" (including

*Cf. also In re Grand Jury Proceedings,* 810 F.2d 580, 588 (6th Cir.1987).

Returning to the question of § 707(b) of the Bankruptcy Code, as added by the 1984 amendments, this court has found in the legislative history no logical reason or explanation as to why a dismissal power for an abuse of chapter 7 should be limited to consumer debtors—if ability to repay debts is the touchstone for such dismissal. The court likewise has not been pointed to any such reason to focus only on consumer debtors in either the briefs or oral arguments of the parties in this case.

If the touchstone for dismissal is in fact the ability to repay debts, and the same is deemed by the legislature to constitute an "abuse" of chapter 7, *no reason* logical or otherwise has been given as to why all debtors seeking chapter 7 relief should not be subject to the same abuse standard. A similar situation was presented in *U.S. Dept. of Agriculture v. Moreno, supra,* where the Supreme Court was dealing with a statute aimed at "abuse" of the food stamp program. [413 U.S. at 534, 93 S.Ct. at 2825] The Court concluded that the classification there employed by Congress (which was underinclusive if abuse was the objective) was not rationally related to excluding "those persons who are 'likely to

abuse the program'...." [413 U.S. at 538, 93 S.Ct. at 2827].

An individual who causes a negligent automobile accident and injury to another, and seeks relief from the resulting judgment in chapter 7 notwithstanding a clear ability to repay the judgment within a reasonable period from future earnings, is not covered by the provisions of § 707(b) as it has been construed by the majority of courts dealing with the statute. It seems self-evident that such a situation involves just as much of an "abuse" of chapter 7 as the case of a debtor who has gotten in over his head with debts by use of a credit card for consumer purchases. Likewise, an individual debtor whose debts stem from a small proprietorship business operation is also excluded from § 707(b), as it has been construed, notwithstanding a clear ability to repay his creditors.

The most that the United States and AFSA can give as an explanation for the use by Congress of an underinclusive classification in § 707(b) is that Congress was reacting to intensive pressure from the consumer credit industry in 1984 to enact various amendments designed to encourage less reliance on chapter 7, and more reliance on chapter 13 repayment plans, to counteract an asserted overuse of chapter 7 proceedings. That explanation does in

the rational basis test) in deciding equal protection cases does not in fact represent what the court is actually doing. Concurring in the *City of Cleburne* case Justice Stevens reiterates his view in this area:

The Court of Appeals disposed of this case as if a critical question to be decided were which of three clearly defined standards of equal protection review should be applied to a legislative classification discriminating against the mentally retarded. In fact, our cases have not delineated three—or even one or two—such well defined standards. Rather, our cases reflect a continuum of judgmental responses to differing classifications which have been explained in opinions by terms ranging from "strict scrutiny" at one extreme to "rational basis" at the other. I have never been persuaded that these so called "standards" adequately explain the decisional process. Cases involving classifications based on alienage, illegal residency, illegitimacy, gender, age, or—as in this case—mental retardation, do not fit well into sharply defined classifications.

"I am inclined to believe that what has become known as the [tiered] analysis of equal protection claims does not describe a completely logical method of deciding cases, but rather is a method the Court has employed to explain decisions that actually apply a single standard in a reasonably consistent fashion." *Craig v. Boren,* 429 U.S. 190, 212, 97 S.Ct. 451, 464, 50 L.Ed.2d 397 (1976) (STEVENS, J., concurring). In my own approach to these cases, I have always asked myself whether I could find a "rational basis" for the classification at issue. The term "rational", of course, includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class. Thus, the word "rational"—for me at least—includes elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially. [105 S.Ct. at 3260–3261]

fact accord with the surrounding circumstances of the 1984 legislation. *See, e.g.,* Breitowitz, *New Developments In Consumer Bankruptcies: Chapter 7 Dismissal On The Basis Of 'Substantial Abuse',* 59 Am.Bankr.L.J. 327, 323–330, 344–348 (Fall 1985); Balser, *Section 707(b) Of The Bankruptcy Code: A Road Map With A Proposed Standard For Defining Substantial Abuse,* 19 J.L. Reform 1011, 1015–1019 (Summer 1986); Gross, *Preserving A Fresh Start For The Individual Debtor: The Case For Narrow Construction Of The Consumer Credit Amendments,* 135 U.Pa.L.Rev. 59, 61–67 (1986).

But an explanation as to *why* Congress did something does not by itself answer the question as to whether *what* it did had a logical and rational basis for discriminating between classes of similarly-situated persons in providing an underinclusive classification of those persons to be subjected to restriction on legal benefits and relief.[5]

It is true that the cases establish a general principle that the courts will not unduly interfere in legislative judgments as to what portion of a particular social or economic problem to attack by remedial legislation. Congress cannot be required as a general principle to attack all aspects of a problem when it appears to the legislative judgment that it is more feasible and timely to attack a particular aspect first. *Williamson,* 348 U.S. at 489, 75 S.Ct. at 465; *Bowen,* 476 U.S. at 347–48, 106 S.Ct. at 1886.

In the case of § 707(b), however, there is simply no reason apparent in either the legislative history or otherwise to support the idea that expanding the "ability to repay" concept to all chapter 7 individual debtors would in any way have hampered or thwarted the legislative desire to address this issue. As indicated above, the additional cases which would be brought within the ambit of § 707(b) are relatively small in number, and are indistinguishable

in terms of an "abuse" problem from the situation of debtors having primarily consumer debts. Not only does an abuse continue to be an abuse regardless of the nature of the debtor and his debts, but an arbitrary classification continues to be arbitrary for equal protection purposes notwithstanding the understandable legislative predilection for responding to those special interest groups who focus its attention upon a particular social or economic problem.

Accordingly, I believe that the enactment of § 707(b), if it is to be read as disqualifying consumer debtors for chapter 7 relief merely upon a showing of ability to repay debts out of future income, does present a substantial question regarding possible constitutional invalidity under the equal protection clause as incorporated by the Fifth Amendment to the United States Constitution. For reasons which appear below, however, I also conclude that it is unnecessary to reach the constitutional question in the present case by virtue of an appropriate statutory construction of the language of § 707(b), in the context of its legislative history, the context of the other pertinent provisions of the Bankruptcy Code, and in the context of the history of our bankruptcy laws as they apply to individual debtors and discharge relief since the enactment of the Bankruptcy Act of 1898.

### STATUTORY CONSTRUCTION

The foregoing discussion demonstrates in my judgment that a substantial question of constitutionality *is* presented by § 707(b) of the Bankrutpcy Code. This triggers the well-established principle that a federal court in such a situation should determine whether any statutory construction is possible that will avoid the necessity of deciding the constitutional question. In the case of *United States v. Security Industrial Bank,* 459 U.S.70, 78, 103 S.Ct. 407, 412, 74

---

5. For cases rejecting an "explanation-is-a-justification" response to an equal protection challenge, *see, e.g., Examining Board v. Flores de Otero,* 426 U.S. 572, 605, 96 S.Ct. 2264, 2283, 49 L.Ed.2d 65 (1976); *Graham v. Richardson,* 403 U.S. 365, 374, 91 S.Ct. 1848, 4853, 29 L.Ed.2d

534 (1971). *Cf. also Walsh v. Gowing,* 494 A.2d 543 (R.I.1985) (fact that lobbying group was actual sponsor of legislation does not require determination of legislative intent consistent with group's goals).

L.Ed.2d 235, 7 CBC 2d 629, 634 (1984), the Supreme Court was presented with the possible unconstitutionality of § 522(f)(2) of the Bankruptcy Code, if that section had to be read as applying retroactively. The court avoided the constitutional question by statutory construction noting:

> The foregoing discussion satisfies us that there is substantial doubt whether the retroactive destruction of the appellees' liens in these cases comports with the Fifth Amendment. We now consider whether, as a matter of statutory construction, § 522(f)(2) must necessarily be applied in that manner. We consider the statutory question because of the " 'cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided.' " *Lorillard v. Pons,* 434 U.S. 575, 577 [98 S.Ct. 866, 868, 55 L.Ed.2d 40] (1978), quoting *Crowell v. Benson,* 285 U.S. 22, 62 [52 S.Ct. 285, 296, 76 L.Ed. 598] (1932).

*See also,* to the same effect, *Benoni v. Boston & Maine Corporation,* 828 F.2d 52 (1st Cir.1987).

This general principle has been applied by the Supreme Court specifically in a case involving an equal protection constitutional question. As the Court noted in *Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985):

> Respondents wish us to hold that the equal protection component of the Fifth Amendment has no bearing on an unadmitted alien's request for parole. "Prior to reaching any constitutional questions, federal courts must consider nonconstitutional ground for decision." *Gulf Oil v. Bernard,* 452 U.S. 89, 99 [101 S.Ct. 2193, 2199, 68 L.Ed.2d 693] (1981); *Mobile v. Bolden,* 446 U.S. 55, 60 [100 S.Ct. 1490, 1496, 64 L.Ed.2d 47] (1980); *Kolender v. Lawson,* 461 U.S. 352, 361, n. 10 [103 S.Ct. 1855, 1860, n. 10, 75 L.Ed.2d 903]

(1983), citing *Ashwander v. TVA,* 297 U.S. 288, 347 [56 S.Ct. 466, 483, 80 L.Ed. 688] (1936) (Brandeis, J., concurring). This is a "fundamental rule of judicial restraint." *Three Affliated Tribes of Berthold Reservation v. Wold Engineering,* 467 U.S. 138 [104 S.Ct. 2267, 81 L.Ed.2d 113] (1984). Of course, the fact that courts should not decide constitutional issues unnnecessarily does not permit a court to press statutory construction "to the point of disengenuous evasion" to avoid a constitutional question. *United States v. Locke,* 471 U.S. 84, 96 [105 S.Ct. 1785, 1793, 85 L.Ed.2d 64] (1985). As the Court stressed in *Spector Motor Co. v. McLaughlin,* 323 U.S. 101, 105 [65 S.Ct. 152, 154, 89 L.Ed. 101] (1944), "[i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." See also *United States v. Gerlach Livestock Co.,* 339 U.S. 725, 737 [70 S.Ct. 955, 962, 94 L.Ed. 1231] (1950); *Larson v. Valente,* 456 U.S. 228, 257 [102 S.Ct. 1673, 1690, 72 L.Ed.2d 33] (1982) (Stevens, J., concurring)

Looking at the provisions of § 707(b) enacted in 1984 the essential point of statutory construction in this regard is whether the statute *must* be read to justify a dismissal of a consumer debtor's chapter 7 filing solely upon a showing that the debtor has the ability to repay his or her debts, or a substantial portion thereof, over a period of years out of future income. If that in fact is a *required* reading of the statute the constitutional question under equal protection cannot be avoided, since it is otherwise well-established that no such test relating to future income qualifies the rights of other individual debtors to file a chapter 7 petition.[6]

---

6. *See* 2 *Collier on Bankruptcy* ¶ 109.02 at 109–11 and 109–12 (15th ed. 1988), commenting as follows regarding the general availability of chapter 7 relief:

> The broad scope of the eligibility criteria for participation in chapter 7 cases is intentional

and not altogether surprising given the realization that chapter 7 provides the most basic form of relief, straight liquidation, available under the Bankruptcy Code. Nevertheless, it is worthy of note that a chapter 7 "debtor" need not be insolvent to be eligible for chap-

The Bankruptcy Code nowhere requires insolvency as a requirement of filing a petition under *any* chapter and § 109 of the Code dealing with "Who may be a debtor" likewise imposes no qualification requirements for chapter 7 debtors in terms of insolvency or lack of adequate future income. Comparing the provisions of § 541 and § 1306(a)(2) it is likewise clear that future income of a chapter 7 debtor is not "property of the estate" although it is expressly made such in a voluntary chapter 13 filing.

The provisions of § 707(a) authorizing the court to dismiss any petition under chapter 7 "for cause" has been held not to include a ground based upon ability to repay in whole or in part scheduled debts as a ground "in and of itself" for dismissal. *In re Cecil,* 71 B.R. 730, 15 B.C.D. 918 (Bankr.W.D.Va.1987); *In re Garrow,* 50 B.R. 796 (Bankr.Vt.1985). The legislative history of the enactment of § 707(a) in 1978 also indicates the ability of the debtor to repay his debts in whole or in part would not constitute adequate cause for dismissal under the section. H.R.Rep. No. 595, 95th Cong., 1st Sess. 380, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787; S.Rep. No. 989, 95th Cong., 2d Sess. 94, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787.

It seems clear that the actual wording of § 707(b), i.e., the reference to "substantial abuse" of chapter 7, does not on its face require a reading incorporating an ability to repay out of future income standard. The courts and commentators who have dealt with this language in § 707(b) are unanimous that the phrase is ambiguous and requires resort to legislative history for appropriate statutory construction. [See law review articles cited, supra, page 19; case decisions cited supra, page 5.] Being ambiguous the statute is open to appropriate interpretation and construction by the courts under recognized principles of statutory construction. 73 Am.Jur.2d STATUTES §§ 194, 195 at 392–93 (1974). This statute particularly is not subject to the "plain meaning rule" restricting the scope of statutory construction. *Cf. Ciampa v. Secretary of H.H.S.,* 687 F.2d 518, 524 (1st Cir.1982).[7]

Construing § 707(b) in terms of the legislative history surrounding its enactment in 1984 is made difficult because, as will be indicated below, there simply is no legislative history in the ordinary sense as to the crucial language added and deleted in the final bill that emerged out of a conference

---

ter 7 relief. Nor does the standard established for those persons who "may be" debtors under chapter 7 contain any specific or implied requirement that such persons be heavily burdened by debts. Under this subdivision any person not within the excluded class who owes debts in any amount, no matter how small, may file a petition for liquidation. It is interesting to note that various legislative attempts to establish a minimum amount of debts owed as a criterion for eligibility for relief have never succeeded, as such minimum requirements have been seen as being an unnecessary hardship which should not be inflicted upon small but certainly hard-pressed debtors. A debtor under chapter 7 may be solvent or insolvent, and his or her motive is generally considered to be immaterial, except that the debtor may not file a petition for the purpose of perpetrating a fraud. Thus, there is no reason why, if a solvent person cares to have its property distributed among its creditors through bankruptcy liquidation, it should not be allowed to do so, provided, of course, that the bankruptcy court has jurisdiction.

7. As the Court of Appeals for the First Circuit has recently noted the "plain meaning rule" is rarely strictly applied in the more recent federal decisions. *Benoni v. Boston & Maine Corporation, supra* at 58, where the court comments:

Last, but not least, we should point to well-established Supreme Court doctrine which rejects the extreme adherence to the "plain meaning rule" promoted by appellant. *See United States v. American Trucking Association,* 310 U.S. 534, 543–44 [60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345] (1940) ("[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination'."); *Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp.,* 348 U.S. 437, 422 [75 S.Ct. 489, 491, 99 L.Ed. 510] (1955); *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 9 [96 S.Ct. 1938, 1942, 48 L.Ed.2d 434] (1976); *see generally* Murphy, *Old Maxims Never Die: The "Plain Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts,* 75 Colum.L.Rev. 1299 (1975).

committee with no separate conference analysis report. Moreover, in evaluating such legislative history as exists, it is important to have some historical perspective as to the dilemma that was presented to Congress by the 1983 and 1984 attempts to enact a threshold future income test and the ultimate "substantial abuse" language. The evaluation requires an understanding of some fundamental aspects of bankruptcy law that have been developed over a ninety-year period by case decisions, primarily from the Supreme Court, which has been powerful enough to have been considered in practical terms throughout that history as though such principles were written into the statutes themselves, starting with the Bankruptcy Act of 1898, continuing with the Chandler Act of 1938, and on into the Bankruptcy Reform Act of 1978.

Less than 20 years after enactment of the Bankruptcy Act of 1898, the Supreme Court was presented with the contention that contingent liabilities owing by a voluntary individual bankrupt (essentially identical to an individual debtor filing a chapter 7 petition under the current Code) were not discharged by bankruptcy discharge and survived the bankruptcy. The Court rejected that contention in *Williams v. United States Fidelity & Guarantee Company*, 236 U.S. 549, 35 S.Ct. 289, 59 L.Ed. 713 (1915), and commented at pp. 554–57, 35 S.Ct. at pp. 290–91 of its opinion as follows:

> It is the purpose of the Bankrupt Act to convert the assets of the bankrupt into cash for distribution among creditors and then to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes. *Wetmore v. Markoe*, 196 U.S. 68, 77 [25 S.Ct. 172, 175, 49 L.Ed. 390]; *Zavelo v. Reeves*, 227 U.S. 625, 629 [33 S.Ct. 365, 367, 57 L.Ed. 676]; *Burlingham v. Crouse*, 228 U.S. 459, 473 [33 S.Ct. 564, 568, 57 L.Ed. 920]. And nothing is better settled than that statutes should be sensibly construed, with a view to effectuating the legislative intent. *Lau Ow Bew v. United States*, 144 U.S. 47, 59 [12 S.Ct. 517, 520, 36 L.Ed. 340]; *In re Chapman*, 166 U.S. 661, 667 [17 S.Ct. 677, 679, 41 L.Ed. 1154].

\* \* \* \* \* \*

> Although, unlike the act of 1867, the present one contains no express provision permitting proof of contingent claims, it does in substance afford the surety on a liability susceptible of liquidation the same relief possible under the earlier act, *i.e.*, application to the principal debt of all dividends declared out of the estate (act of March 2, 1867, §§ 19, 27, c. 176, 14 Stat. 517, 525, 529). And as the surety thus either shares or enjoys an opportunity to share in the principal's estate, we think the discharge of the latter acquits the obligation between them incident to the relationship. *Mace v. Wells*, 6 How. 272, 276 [12 L.Ed. 698]; *Fairbanks v. Lambert*, 137 Massachusetts 373, 374; *Hayer v. Comstock*, 115 Iowa, 187, 191 [88 N.W. 351]; *Post, Admr., v. Losey*, 111 Indiana, 74, 80 [12 N.E. 121]; *Smith v. Wheeler*, 55 App.Div. (N.Y.) 170, 171 [66 N.Y.S. 780].

> It would be contrary to the basal spirit of the Bankrupt Law to permit a surety, by simply postponing compliance with his own promise in respect of a liability until after bankruptcy, to preserve a right of recovery over against his principal notwithstanding the discharge would have extinguished this if the surety had promptly performed as he agreed. Such an interpretation would effectually defeat a fundamental purpose of the enactment.

Nineteen years later, the Supreme Court was called upon to specifically consider the question of whether the debtor's future income following a bankruptcy discharge could be reached by creditors. In *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934), the court rejected the contention by a creditor who had taken an assignment of future-earned wages to secure a loan that he had an enforceable lien under state law which would survive the discharge and therefore could not be enjoined from pursuing his remedy in the state courts. The highest state court had

already held that the assignment *was* a lien within the meaning of § 67(d) of the Bankruptcy Act enforced at that time and that accordingly the creditor's rights survived the discharge. The Supreme Court held to the contrary, notwithstanding the state court determination and the specific provision of § 67(d) of the Act. The Supreme Court found an overriding purpose inherent in the bankruptcy law was involved:

> One of the primary purposes of the bankruptcy act is to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Williams v. U.S. Fidelity & G. Co.,* 236 U.S. 549, 554–555 [35 S.Ct. 289, 290, 59 L.Ed. 713]. This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns *at the time of bankruptcy,* a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt. *Stellwagen v. Clum,* 245 U.S. 605, 617 [38 S.Ct. 215, 218, 62 L.Ed. 507]; *Hanover National Bank v. Moyses, supra; Swarts v. Fourth National Bank,* 117 Fed. 1, 3; *United States v. Hammond,* 104 Fed. 862, 863; *Barton Bros. v. Texas Produce Co.,* 136 Fed. 355, 357; *Hardie v. Swafford Bros. Dry Goods Co.,* 165 Fed. 588, 591; *Gilbert v. Shouse,* 61 F. (2d) 398. The various provisions of the bankruptcy act were adopted in the light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act. [292 U.S. at p. 244, 54 S.Ct. at p. 699]

The Supreme Court in *Local Loan* emphasized that public concerns were involved, just as well as the interest of the individual debtor, in the question of whether a bankruptcy debtor would be required to devote his future efforts and future income to the repayment of his pre-bankruptcy debts:

The power of the individual to earn a living for himself and those dependent upon him is in the nature of a personal liberty quite as much as, if not more than, it is a property right. To preserve its free exercise is of the utmost importance, not only because it is a fundamental private necessity, but because it is a matter of great public concern. From the viewpoint of the wage earner there is little difference between not earning at all and earning wholly for a creditor. Pauperism may be the necessary result of either. The amount of the indebtedness, or the proportion of wages assigned, may here be small, but the principle, once established, will equally apply where both are very great. The new opportunity in life and the clear field for future effort, which it is the purpose of the bankruptcy act to afford the emancipated debtor, would be of little value to the wage earner if he were obliged to face the necessity of devoting the whole or a considerable portion of his earnings for an indefinite time in the future to the payment of indebtedness incurred prior to his bankruptcy. [292 U.S. at p. 245, 54 S.Ct. at p. 699]

More recently the Supreme Court held in *Lines v. Frederick,* 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970), that a bankrupt wage earner's vacation pay, accrued but unpaid at the time of the filing of his petition, did not pass to the trustee in bankruptcy as "property" under § 70a(5) of the Bankruptcy Act. In reaching its decision the court in *Lines* commented:

> The most important consideration limiting the breadth of the definition of "property" lies in the basic purpose of the Bankruptcy Act to give the debtor a "new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt. The various provisions of the bankruptcy act were adopted in the light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act." *Local Loan Co. v. Hunt,* 292 U.S. 234, 244–245

[54 S.Ct. 695, 699, 78 L.Ed. 123] (citations omitted).

\* \* \* \* \* \*

[T]he respondents here are wage earners whose sole source of income, before and after bankruptcy, is their weekly earnings. The function of their accrued vacation pay is to support the basic requirements of life for them and their families during brief vacation periods or in the event of layoff. Since it is a part of their wages, the vacation pay is "a specialized type of property presenting distinct problems in our economic system." *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 340 [89 S.Ct. 1820, 1822, 23 L.Ed.2d 349]. Where the minimal requirements for the economic survival of the debtor are at stake, legislatures have recognized that protection that might be unnecessary or unwise for other kinds of property may be required. *See, e.g.,* the Consumer Credit Protection Act, § 301, 82 Stat. 163, 15 U.S.C. § 1671 (1964 ed., Supp. V).

The wage-earning bankrupt who must take a vacation without pay or forgo a vacation altogether cannot be said to have achieved the "new opportunity in life and [the] clear field for future effort, unhampered by the pressure and discouragement of preexisting debt," *Local Loan Co. v. Hunt, supra,* which it was the purpose of the statute to provide. [400 U.S. pp. 18–20, 91 S.Ct. pp. 113–114]

These basic principles involving a chapter 7 voluntary bankruptcy filing have been restated repeatedly by the lower courts under the current Bankruptcy Code. *See, e.g., Shine v. Shine,* 802 F.2d 583, 585 (1st Cir.1986), *quoting In re Cross,* 666 F.2d 873, 879 (5th Cir.1982) ("[t]he overriding purpose of the bankruptcy laws ... to provide the bankrupt with comprehensive, much needed relief from the burden of his indebtedness by releasing him from virtually all his debts.").

It is interesting to note that the "reading into the statute" by the Supreme Court of the exclusion of future income as property of the estate has been so strongly in the mind of Congress that Congress did not find it necessary to include future income in its exclusions from "property of the estate" in the Bankruptcy Code. *See* 11 U.S.C. § 541(b). Indeed, one commentator has noted that the concept of the fresh start discharge for the honest but unfortunate debtor enunciated in the *Local Loan* decision "has passed into bankruptcy lore." Jackson *The Logic And Limits Of Bankruptcy Law,* Chapter 10, "The Fresh Start Policy In Bankruptcy Law", page 226 (Harvard University Press 1986).[8]

Part of the history surrounding American bankruptcy laws is the fact that Congress has repeatedly refused efforts to modify our bankruptcy laws to adopt the English system providing for contingent discharges whereby discharge does not occur until a future date after the debtor has paid some or all of his debts. An attempt to adopt the English system in 1932 was subjected to strenuous opposition and defeated. *Joint Hearings before Subcomms. of House and Senate Judiciary Comms. on S. 3863,* 73d Cong., 1st Sess., 546, 743 (1932), discussed in Countryman, *Bankruptcy and the Individual Debtor—And a Modest Proposal to Return to the Seventeenth Century,* 32 Cath.U.L.Rev. 809, 820–821 (Summer 1983).

Turning to the specific legislative history dealing with the 1984 enactment of § 707(b), the sad fact as all commentators have agreed is that there is no normal legislative history dealing with the crucial language at issue. *See,* Gross, *Preserving A Fresh Start For The Individual Debtor,*

---

**8.** Professor Jackson in Chapter 10 of his book, in dealing with the fresh-start-policy, considers at some length the rationale and justification for the nonwaiveability of an individual's right to seek a discharge by a chapter 7 bankruptcy filing. Also relevant in this regard, in demonstrating the strong established policy prior to the 1984 enactment of § 707(b), are the provisions of § 1307(a) and § 1307(b) rendering unenforceable any waiver by a debtor of his right to convert or dismiss a voluntary chapter 13 filing. These provisions were undisturbed by the 1984 Amendments and accordingly continue to provide that a debtor has an unwaiveable right to convert a chapter 13 voluntary repayment plan proceeding into a chapter 7 proceeding, thus seeking a discharge without subjecting his future earnings to bankruptcy court jurisdiction.

135 U.Pa.L.Rev. 59, 66–67; Balser, *Section 707(b) Of The Bankruptcy Code*, 19 J.L. Reform 1011, 1018; *New Development In Consumer Bankruptcies*, 59 Am.Bankr. L.J. 327, 336, 344. The bill which actually added § 707(b) was H.R. 5174 which came out of a conference committee with no conference report other than reporting the terms of the agreed bill. The hurried nature of the enactment of H.R. 5174, reacting primarily to the pressure to reinstitute the bankruptcy courts (whose terms of office had actually expired under the old bankruptcy system) and the political pressure regarding the overruling of a recent Supreme Court decision allowing rejection of union labor contracts is a matter of public record.[9]

It is fair to state that the lobbyists for the consumer credit industry had been pressing consistently since 1981 for statutory amendments which would restrict availability of chapter 7 relief to individual debtors. Earlier bills considered in both the House and Senate had in fact included a threshold future income test which would have barred chapter 7 relief to debtors showing an ability to repay a substantial portion of their scheduled debts. H.R. 4786, 97th Congress, 1st Sess. (1981); S. 2000, 97th Congress, 1st Sess., 127 Cong. Rec. 32, 195 (1981); S. 445 (reintroduction of S. 2000), 98th Cong., 1st Sess., 129 Cong. Rec. S. 5728 (daily ed. April 28, 1983). Further detail and discussion of these bills appears in Balser, *supra,* 19 J. of Law Reform at 1018–1019; Breitowitz, *supra,* 59 A.B.L.J. at 345–347; and Countryman, *supra,* 32 Cath.Univ.L.Rev. at 826. At one point S. 445 even had a provision under which a debtor could only file *conditionally* under chapter 7 or chapter 13, subject to a mandatory "debtor counseling" session with the trustee in which the debtor would be advised as to the provisions of each chapter and the trustee was to review the debtor's income and amount of debt to determine whether chapter 13 was feasible. Senate Report 98–65, 98th Cong., 1st Sess. 53–55 (1983), accompanying S. 445.[9A]

The simple fact is that there is *no* legislative history of any sort discussing or describing any reasons as to why the future income test was deleted from the earlier bills before the House and Senate agreed on the enactment of H.R. 5174 as Public Law No. 98–353, the Bankruptcy Amendments and Federal Judgeship Act of 1984. It is also clear that Congress could not agree on a definition of "substantial abuse" which would take into account the countervailing considerations regarding the well-established principle of a fresh start for a chapter 7 debtor and the specific relevance of future income of a debtor to the language employed in § 707(b). The Bankruptcy Code was not amended to give a specific definition of the "substantial abuse" concept.

The crucial ambiguity as to the "substantial abuse" language added by § 707(b) in 1984 is that that enactment followed a clear stand-off between the forces that wanted to preserve the historically entrenched concept of a fresh start for chapter 7 debtors under our bankruptcy laws, as opposed to the forces reacting to the consumer credit industry's complaint that consumer debtors were abusing the Bankruptcy Code. One thing that is *not* ambiguous is that Congress did defeat the attempt to impose a threshold future income test as a qualification for chapter 7 relief for consumer debtors.

---

**9.** See Gross, *supra,* 135 U.Pa.L.Rev. at 81.

**9A.** The future income test apparently had been deleted from S. 445 by the time S.Rep. 98–65 was submitted on April 26, 1983. See Balser, *supra,* 19 J. of Law Reform at 1018. However, the conditional filing and debtor counseling provisions remained. S. 445 also included a "substantial abuse" dismissal provision and the Senate Report contains language referring to this provision in terms including a reference to ability to repay debts out of future income. See

S.Rep. 98–65, at 53–54. However, S. 445 was not the vehicle for final enactment, although the substantial abuse language with some changes was carried over into H.R. 5174. See Breitowitz, *supra,* 59 A.B.L.J. at 346. There is no House committee report, or Conference Report indicating that the House acceded to the Senate Committee's view on the meaning of the substantial abuse language on another bill, i.e., S. 445, which was *not* passed by either chamber.

When the Conference Report on H.R. 5174 was adopted by the Senate, Senator Metzenbaum noted on the floor of the Senate that "both the House and Senate have agreed to the total elimination of the future income language. Under H.R. 5174, the availability of bankruptcy relief would not be limited by a future earning standard." 130 Cong. Rec. S. 7624 (Daily Edition, June 29, 1984). In the House of Representatives, Chairman Rodeno on the House floor noted with regard to the result of the conference on H.R. 5174 that the consumer credit amendments were "fair to both debtors and creditors, and contain no threshold or future income test." 130 Cong.Rec. H. 7489 (Daily Edition, June 29, 1984). A contrary effort to read the Consumer Credit Amendments in terms more favorable to the objectives of the Consumer Credit Industry appears in the remarks of Senator Hatch on the floor of the Senate: "Another important provision in title III prevents abuse of the code. If the court finds that 'granting of relief would be a substantial abuse of the code,' it may, after an adequate hearing, dismiss a chapter 7 petition. As I mentioned earlier, title III contains more than 30 amendments to ensure that a 'fresh start' does not become a 'head start.'" (130 Cong.Rec. S. 8891), (June 29, 1984). Numerous other comments pro and con an expansive reading of the "substantial abuse" language of § 707(b) can be found by other senators and representatives. These quotations have been used by courts and commentators to justify a particular position on this issue, but in my judgment they do nothing more than express the views of advocates attempting "for posterity" to slant the interpretation one way or another when in actual fact Congress never came to grips in a collective manner with the issue. *Cf. Blitz v. Donovan,* 740 F.2d 1241, 1247 (D.C.Cir.1984); Singer, 2A *Sutherland Statutory Construction* § 48.13 (C. Sands 4th ed. 1984).

Such comments with regard to § 707(b) do not, in my judgment, express a collective mind and intent of Congress with regard to the *net effect* of the deletion of the future income threshold test, coupled with the retention of the "substantial abuse" language, as the proposal was actually enacted into law. But these events do establish conclusively that the concept of a threshold requirement for qualification to file a chapter 7 petition in terms *solely* of an ability to repay debts out of future income *was* decisively defeated by both houses of Congress.

The rejection by Congress of contemporaneous efforts to add a future income or ability to repay qualification to the right to chapter 7 relief is a strong point in support of a narrow reading of the "substantial abuse" language enacted by § 707(b). The Supreme Court in *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974), in refusing to read certain ambiguous language added to the Clayton Act, to bring within federal regulation various intrastate highway material manufacturing facilities, commented as follows:

The Conference Committee, however, deleted this "effects on commerce" provision, leaving only the "in commerce" language of § 2(a). Whether Congress took this action because it wanted to reach only price discrimination in interstate markets or because of its then understanding of the reach of the commerce power, its action strongly militates against a judgment that Congress intended a result that it expressly declined to enact. Moreover, even if the legislative history were ambiguous, the courts in nearly four decades of litigation have interpreted the statute in a manner directly contrary to an "effects on commerce" approach.... In the face of this longstanding interpretation and the continued congressional silence, the legislative history does not warrant our extending § 2(a) beyond its clear language to reach a multitude of local activities that hitherto have been left to state and local regulation. [419 U.S. at pp. 200–201, 95 S.Ct. at p. 401]

It should also be noted that statutory construction principles generally discourage a reading of an ambiguous statutory provision as reversing well-established judi-

cially created principles. In a case dealing with the abandonment provisions of the Bankruptcy Code the Supreme Court in *Midlantic National Bank v. New Jersey Department Of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed. 2d 859, *reh'g denied,* 475 U.S. 1090, 106 S.Ct. 1482, 89 L.Ed.2d 736 (1986), refused to read the provisions of § 554 in the 1978 Bankruptcy Code as overruling well-recognized restrictions on a trustee's abandonment power. The court commented:

> The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 266–267 [99 S.Ct. 2753, 2759–60, 61 L.Ed. 2d 521] (1979). The Court has followed this rule with particular care in construing the scope of bankruptcy codifications.

The discussion above regarding the *Williams* and *Local Loan* line of decisions establishes that the fresh start concept pertinent to the § 707(b) issue *was* well ingrained in the interpretation of the bankruptcy laws prior to 1984.

The court of appeals for this circuit has very recently applied the foregoing principle of statutory construction in a case involving interpretation of § 506(b) of the Bankruptcy Code, in *In re Newbury Cafe, Inc.,* 841 F.2d 20, 22 (1988). The court of appeals there stated:

> Nothing affirmatively rebuts the initial inference that Congress had no intention, in enacting section 506(b), to change existing law. Instead, it is to be noted that the other two exceptions to post-petition interest stated in *Boston & Maine* were preserved intact. *See* sections 552(b) and 726(a)(5); *Boston & Maine,* 719 F.2d at 496. It is only reasonable to assume that the drafters of the Code were familiar with existing law, and would not, without good cause, break up its symmetry.

*See, also, In re El San Juan Hotel,* 809 F.2d 151 (1987) (construing 28 U.S.C. § 158(a) dealing with standing to appeal bankruptcy court orders).

Closer to home, the undersigned bankruptcy judge was reversed by the court of appeals for this circuit for a too literal reading of the statutory language added by the 1978 Bankruptcy Code in § 523(a)(5) dealing with the dischargeability of obligations arising from child and spousal support obligations. *Shine v. Shine,* 802 F.2d 583, 65 B.R. [18] (1st Cir.1986). The court there held that the limiting language "in connection with" referring to such obligations in the new statute, in terms of specific agreements and court decrees, need not be read literally as overruling general principles long-established with regard to the dischargeability of such obligations. The court commented:

> Under the interpretation of the statute urged by the appellant, the 1978 Amendment would be viewed as reversing this long-standing differentiation between property settlements and alimony or payments for maintenance and support. Under appellant's interpretation, property settlements, traditionally dischargeable, would have become nondischargeable, while alimony and payments for maintenance and support, traditionally nondischargeable, would have been limited by a strictly construed "in connection" clause. We, therefore, examine the history of the 1978 Amendment to determine whether such a reversal was intended by Congress.
>
> \* \* \* \* \* \*
>
> This final version, produced in the "harried and hurried atmosphere" in which the bill was finally enacted, should not be read to effect a reversal of the long-standing principles governing this area. Such a reversal would surely have been noted in the congressional discussions. Yet, neither the House nor Senate Committee Reports accompanying the final version make any reference to a limitation upon support debts considered nondischargeable. The Senate Report does not even mention the "in connection" language in its discussion of the section nor does it suggest that any kind of new limitation had been imposed. S.Rep. No. 989, 95th Cong., 2d Sess. 79,

*reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5865. The House Report follows the Senate Report in its general discussion, H.R.Rep. No. 595, 95th Cong., 2d Sess. 364, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6320. In its section-by-section discussion of § 523(a)(5), the House Report merely restates the "in connection" language without explaining any effect it might have on dischargeability. *Id.* at 6454.

\* \* \* \* \* \*

After this examination of the legislative history of § 523, as well as of the established principles in this area, we cannot agree with the Bankruptcy Court's view of the requirements for nondischargeability under the 1978 statute. Congressional policy in this area has always been to ensure that genuine support obligations would not be discharged. Interpreting the statute to require the test proposed would violate the principle that in bankruptcy law, "substance will not give way to form ... technical considerations will not prevent substantial justice from being done." *Pepper v. Litton,* 308 U.S. 295, 305 [60 S.Ct. 238, 244, 84 L.Ed. 281] (1939). While the wording of the statute may have given rise to some confusion, "[t]he result of an obvious mistake should not be enforced, particularly when it 'overrides common sense and evident statutory purpose.'" *In re Adamo,* 619 F.2d 216, 222 (2d Cir.1980), *cert. denied,* 449 U.S. 843 [101 S.Ct. 125, 66 L.Ed.2d 52] (1980) (quoting *United States v. Brown,* 33 U.S. [8 Pet.] 18, 26 [8 L.Ed. 852] (1948)). [802 F.2d 583, 587–88]

Applying these statutory construction principles it appears to me that an expansive reading of the "substantial abuse" language of § 707(b) is not necessary, and is not required by the legislative history surrounding the enactment of the statute. In this regard I find persuasive and adopt generally the analysis of Professor Gross in her 1986 law review article cited above. The following extracts from the article give the nub of her analysis leading to a conclu-

sion favoring a narrow construction of the consumer credit amendments:

If the expansive paradigm continues to be adopted by courts, whether in holding or dicta, then the credit industry will achieve indirectly what they would not convince Congress to adopt directly, namely a threshold entry-level standard for utilization of Chapter 7 by individual debtors. Under section 109 of the Code, which was unchanged by the Amendments, any person, including an individual, can be a debtor under Chapter 7 unless she falls within one of several limited exceptions, none of which apply to consumer debtors and none of which are predicated upon anticipated income. Nothing in the Code mandates that a debtor be insolvent to file for relief; a solvent person may determine that she needs relief from indebtedness under Chapter 7. Nothing in the language of the Code prohibits a debtor's election to discharge her debts by liquidating her non-exempt assets in lieu of making continuous payment to creditors over an extended period of time.

\* \* \* \* \* \*

On its face, admittedly, section 707(b) does not suggest that the expansive interpretation adopted increasingly by the courts is impermissible. Indeed, as has been suggested, the passage of the Amendments in an environment sympathetic to the credit industry's position might permit the argument that such an interpretation is mandated. The argument fails, however, because, as it has also been noted, neither the language of the existing Code provisions nor Congress's defeat of a threshold test for Chapter 7 suggests an expansive interpretation. The Amendments might well have been intended to reestablish an appropriate balance between the interests of debtors and creditors, given the perception that the balance had shifted in favor of debtors. There is, however, no evidence that Congress intended to alter fundamental bankruptcy policy.

\* \* \* \* \* \*

A nonexpansive interpretation of section 707(b) that would not eviscerate the section might suggest that 707(b) was designed to codify a court's implied right to dismiss any Chapter 7 case involving consumer debtors that subverts the purposes of filing under the Chapter. Phrased differently, this narrow interpretation suggests that section 707(b) makes explicit the longstanding ability of a court to dismiss a Chapter 7 case for *lack of good faith.* Both Chapters 11 and 13 have express good faith provisions as prerequisites for relief thereunder. The reading of section 707(b) to include a good faith standard is not equivalent to stating, as do proponents of the expansive paradigm, that the availability of future income is a basis for dismissal. This lack of equivalency is supported by the case law of Chapter 13. Prior to the passage of the Amendments, creditors expressed concern that the inclusion of a good faith standard in Chapter 13 had not been read consistently by the courts to mean that a debtor must give all of her future income to her creditors. It is because good faith did not imply a requirement that all available income be applied to pay creditors that creditors fought for the adoption of the more explicit provision of section 1325(b). Accordingly, creditors cannot reasonably suggest that the insertion of a good faith standard in Chapter 7 achieves something they knew it never accomplished in the context of a Chapter 13 case.

Section 707(b), as interpreted under a narrow paradigm, would permit a court to dismiss a Chapter 7 case where an individual debtor's conduct in incurring the debts that she seeks to have discharged was of a nature sufficient, in the words of one court interpreting this section, "to shock the conscience of the Court." The question of whether a case should be dismissed under section 707(b) ought to be decided on a case-by-case analysis, rather than on the basis of a rigid predetermined test keyed to future income alone. Under a narrow paradigm, section 707(b) is intended to cover those very few cases in which the debtor's conduct does not fit squarely within any of the explicit standards for dismissal or nondischargeability set out in Chapter 7, but in which the debtor's conduct is of such a nature that recourse to the provisions of Chapter 7 generally, particularly in view of the attendant injury to creditors, would contravene the most fundamental notions of fairness and the purposes of Chapter 7. The phrase "of the provisions of Chapter 7" in section 707(b) should be read, then, to apply to either implicit or explicit violations of the provisions and philosophy underlying Chapter 7 cases.

A narrow interpretation of section 707(b) would require courts to make a very different analysis from that which they have made and may continue to make under an expansive interpretation. Rather than focusing on the single, rigid standard of whether a debtor can repay creditors out of future income, courts will focus on the nature of Chapter 7 and the debtor's obligations, with a view towards determining whether this debtor is what one could term an "honest" as distinguished from "dishonest" debtor. Such an inquiry is consistent with a prevailing theme in bankruptcy jurisprudence: the bankruptcy laws should protect honest debtors who have unfortunately incurred obligations that they cannot repay, but not debtors who have systematically defrauded their creditors. [135 U.Pa.L.Rev. at 92, 97, 100–101]

A narrow construction of § 707(b) also avoids inconsistency with other remaining, unchanged provisions of the Bankruptcy Code which would raise obvious conflict with § 707(b) broadly interpreted. The provisions of § 109 and § 1307(a) have been discussed above. It should also be noted that if Congress truly intended that § 707(b) be used to dismiss chapter 7 petitions solely on a showing that a debtor could fund a chapter 13 plan, it would have removed the statutory limitation on the amount of debt a debtor may have before coming under chapter 13 of the Code. *See In re Mastroeni,* 56 B.R. 456 (Bankr.S.D.N.Y.1985), noting the inconsistency of a broad

reading of § 707(b) with §§ 109(e) and 706(d) of the Code. It is also interesting to note that Congress did nothing to foreclose resort by a debtor dismissed from chapter 7 from filing a petition under chapter 11 rather than chapter 13 of the Code. Under chapter 11, unlike chapter 13, the debtor's future income is not property of the estate and presumably such a debtor could file a plan under chapter 11 providing only for liquidation of his nonexempt assets for distribution to creditors. This would functionally have the same effect as a chapter 7 filing and would thwart the asserted broad purpose of § 707(b).[10]

Aside from the recent decision by the Court of Appeals for the Ninth Circuit in *In re Kelly, supra,* the cases to date construing § 707(b) have been at the bankruptcy court level. As indicated earlier, the great majority of these cases do give an expansive interpretation to the "substantial abuse" language of § 707(b) and conclude that ability to repay debts out of future income is the primary, if not the only, factor to be considered in determining whether a particular chapter 7 petition should be dismissed under that section. For the reasons I have set out concerning the entire context of the legislative enactment in 1984 I do not find persuasive the broad reading of the "substantial abuse" language in either the *Kelly* opinion or the lower court decisions applying that approach.

I note also that a few decisions, while recognizing ability to repay debts as one factor in a § 707(b) hearing, also have ruled that that factor must be coupled with other factors to constitute "substantial abuse" within the appropriate meaning of the statute. *See, In re Deaton,* 65 B.R. 663, 665 (Bankr.S.D.Ohio 1986) (mere ability to fund chapter 13 plan not sufficient); *In re Shands,* 63 B.R. 121, 124 (Bankr.E.D. Mich.1985) (when coupled "with some egregious circumstance"). A closer reading of some of the other lower court decisions also indicates that "other factors" were

actually involved in the decision, although the language of the opinion may speak primarily in terms of ability to repay debts. *Cf. In re Grant,* 51 B.R. 385, 394 (Bankr.N. D.Ohio 1985) (bad faith in bankruptcy schedules as filed); *In re White,* 49 B.R. 869, 875 (Bankr.W.D.N.C.1985) (implicit in the statutory language is "some type of an unfair advantage" as against creditors).

■ Under the narrow construction of § 707(b) which I here adopt, the dismissal power under § 707(b) is not essentially different from the established power of a bankruptcy court to dismiss a petition under any chapter of the Bankruptcy Code that is filed with a lack of good faith or as an abuse of the process under §§ 105(a) and 707(a) of the Code. As noted in 4 *Collier on Bankruptcy* ¶ 707.03, at 707–9 (15th ed. 1988) the statutory enumeration of causes for dismissal is not exclusive:

> Also, a case may be dismissed if it was not filed in good faith. Bad faith may be found when the debtor has a frivolous, noneconomic motive for filing a bankruptcy petition, when there is a sinister or unworthy purpose, or when there is an abuse of the judicial process. That the debtor is merely taking advantage of its legal rights is not, by itself, sufficient to support a finding of bad faith.

See also, *In re Sacramento Investors,* 28 B.R. 228 (Bankr.E.D.Cal.1983); *In re Kahn,* 35 B.R. 718 (Bankr.W.D.Ky.1984); *In re Dyke,* 58 B.R. 714, 14 CBC 2d 625 (Bankr.N.D.Ill.1986) (relying on § 105(a) in a chapter 13 case for dismissal for "an abuse of the bankruptcy system"). Compare like reasoning under the similar "for cause" dismissal provisions in chapter 11 and § 105(a) in *Furness v. Lilienfield,* 35 B.R. 1006, 10 CBC 2d 930 (D.Md.1983). The courts have exercised this power notwithstanding the deletion of "good faith" language in particular versions of the bankruptcy laws. *See* Ordin, *The Good Faith Principle In The Bankruptcy Code:*

---

**10.** While there is some conflict as to whether individual non-business debtors can file under chapter 11, there is nothing in § 109 that excludes such debtors and at least one court of appeals has held that individual nonbusiness debtors may avail themselves of chapter 11 relief. *In re Moog,* 774 F.2d 1073, 53 B.R. [63] (11th Cir.1985).

*A Case Study,* 38 Bus.Law. 1975 (1983), and cases cited therein.

Section 105(a) of the Bankruptcy Code as enacted in 1978, continued the provision of § 2(a)15 of the prior Bankruptcy Act to the effect that: "The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." In 1986 Congress further amended this statute to eliminate any question about the *sua sponte* of the court's power in this regard adding the following additional sentence: "No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte,* taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, *or to prevent any abuse of process."* 11 U.S.C. § 105(a), *as amended by* Bankruptcy Act of 1986 (emphasis added). This court has recently employed this power to consider dismissal of an individual debtor's chapter 7 petition for abuse of the bankruptcy process, without the need to make any inquiry as to whether the debtor involved had primarily consumer debts.[11]

■ Ability to repay debts may well be a factor in such bad faith filings but it has never been held, in the face of the long-established "fresh start" policy of the bankruptcy laws, that ability to repay a loan is sufficient to establish bad faith for dismissal purposes. The approach instead has been to view the totality of the circumstances surrounding the debtor's affairs, and the immediate events leading to the bankruptcy filing, to determine whether the filing "shocks the conscience of the court" in terms of an abuse of the bankruptcy process. That principle is a venerable principle employed from the beginning by all courts of equity. *See* 27 Am Jur.2d, *EQUITY* § 9 (1966); *Cf.* Gross, *supra,* 135 U.Pa.Law Rev. at 101. Accordingly, since the exercise of the court's discretion under § 707(b) need not be essentially different with regard to consumer debtors as its comparable discretion generally to dismiss petitions for bad faith, no equal protection question arises from the provisions of § 707(b) as so construed.

It can be argued of course that Congress "must have meant something more" by enacting § 707(b) than was already provided to bankruptcy judges for dismissal purposes under the existing provisions of the Bankruptcy Code. *See* Ginsberg, *The Bankruptcy Improvements Act—An Update,* 3 N.Ill.U.L.Rev. 235, 239 (1983). That salutary principle normally is a useful tool in statutory construction, but I conclude that it need not be given any weight in the decidedly non-normal circumstances of the congressional action involved in the enactment of § 707(b) as detailed in this opinion. The legislative history demonstrates quite clearly that Congress simply had no collective mind or intent as to the effect of adding the substantial abuse language while deleting the ability to pay from future income requirement.[12]

If Congress did have any "mind" it was decidedly "schizophrenic" as to that particular and crucial matter. Essentially Congress simply "threw up its arms" on a matter which required legislative policy judgment as to how far, if at all, the established "fresh start" policy of the bankruptcy laws should be overturned. It gave the courts two diametrically conflicting signals—by virtue of the legislative history of the defeat of the earlier bills incorporating

11. See *In re LeClair,* Bankruptcy Case No. 87–551 (Bankr.D.N.H., Order To Show Cause entered December 10, 1987).

12. Professor Gross notes: "The [Consumer Credit] Amendments were passed without an official report from the House or the Senate. Hearings were held on a myriad of proposed changes to the Code dating back to March of 1979.... Thus, while there is a great deal of information that was elicited at hearings with respect to various proposed legislative changes, there is no single report or text that definitively evidences the congressional intent behind any given section." Gross, *supra,* 135 U.Pa.L.Rev. at 66–67. Reports of standing committees, and of a conference committee on final resolution of differences, are the best evidence of legislative intent. *Mills v. United States,* 713 F.2d 1249 (7th Cir. 1983); *Voyageurs National Ass'n v. Arnett,* 609 F.Supp. 532 (D.Minn.1985); *see also* 2A *Sutherland Statutory Construction* §§ 48.06 and 48.08 (C. Sands 4th ed. 1984).

the future income test and the enactment of the ambiguous "substantial abuse" language of § 707(b). In those circumstances, I do not believe that the courts are obligated to create a "collective will" of the legislature on the matter which simply did not exist.[13]

Congress could of course modify, or even abolish, the fresh start policy underlying the bankruptcy laws, but in my opinion they did not set out to do that, nor did they do that, by the enactment of the ambiguous language in § 707(b) of the Bankruptcy Code. It is fair to conclude that the congressional action in 1984 was part of a legislative reaction to claimed abuse of the bankruptcy laws by consumer debtors.[14] As such it does serve to remind the courts that the fresh start policy enunciated by the Supreme Court has always been phrased in terms of the "honest debtor" although neither the Court nor the Congress have ever attempted to spell out the parameters of the latter concept. However, whatever else the concept of the "honest debtor" may mean, it should not be taken to mean (in the absence of an explicit congressional direction to the contrary) that an individual who has simply incurred debts beyond his present ability to repay is *ipso facto* "dishonest" when he seeks to avail himself of the right to chapter 7 discharge relief to which he is otherwise entitled under the clear provisions of the Bankruptcy Code. Much less should it be taken to mean that a business debtor can be "less honest" in that sense than a consumer debtor and still get a chapter 7 discharge.

Congress in §§ 523 and 727 of the Bankruptcy Code has specified through the years various specific grounds for denying discharge or dischargeability. It has never seen fit to include ability to repay debts out of future income as a ground for denial of discharge.

It may well be that I would have been better advised at the outset to heed the ancient admonition that it is not wise to look too closely at the process by which "law and sausages" are made. A lot of time and effort on this matter could have been avoided by a more mechanical application of the statute, rather than this extended wrestling with the perplexing ambiguity of the statutory language in its legislative history context that has forced this overlong opinion. However, on balance I am constrained to conclude that the "legislative sausage" Congress gave the courts by § 707(b) simply does not have a skin strong enough to accomplish the fundamental change in bankruptcy policy that a broad reading of § 707(b) would implement. The statute in my opinion does not justify dismissal of a consumer debtor's chapter 7 petition simply by showing that the debtor has an ability to repay all or a substantial portion of his debts out of future income over a period of years without hardship. If Congress wishes to face up squarely to the policy choice involved in that issue, and say in unambiguous terms that such a debtor is disqualified from chapter 7 relief, the courts of course will be required to implement that policy choice by the legislature. In my judgment Congress has not yet done so.

## APPLICATION TO DEBTOR

With § 707(b) thus construed it is necessary to determine its application to the debtor, Wallace Keniston, under the Order

---

**13.** As noted earlier the manifold statements by legislators on both sides of this fundamental policy issue, on the floor of the legislative chamber, are advocacy statements which cancel each other out and leave the court with no meaningful guidance in the absence of any committee reports or agreed definitional terms in the legislation as enacted. *Cf. also, Weinberger v. Wiesenfeld,* 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514 (1975) ("this Court need not in equal protection cases accept at face value assertions of legislative purposes, when examination of the legislative scheme and its

history demonstrates that the asserted purpose could not have been a goal of the legislation.).

**14.** For full detail of the data regarding perceived overuse of chapter 7 by consumer debtors, and questioning of that data, submitted to Congress by proponents and opponents prior to the enactment of the Consumer Credit Amendments, *see* Breitowitz, *supra,* 59 A.B.L.J. at 327–330, 340–341; Balser, *supra,* 19 J. of L. Reform at 1101–1013; Gross, *supra,* 135 U.Pa.L.Rev. at 61–62, 66, 76–77; Countryman, *supra,* 32 Cath. Univ.L.Rev. at 821–826.

to Show Cause and the facts established in this record.

The debtor and the creditor, Deborah Keniston, were divorced by decree of the Carroll County Superior Court effective October 31, 1979. The debtor remarried in 1980. At the time of the divorce the parties had entered into a permanent stipulation dated October 18, 1979. This 1979 stipulation provided for the custody and support of the parties' minor children, distribution of certain assets, and in paragraph 7 thereof, it required the debtor to pay the second mortgage encumbering the parties' homestead real estate. The amount of the second mortgage payment on the subject real estate was $155.00 per month. The stipulation provided that Deborah Keniston would make the payments on the first mortgage, but the debtor remained personally liable on the mortgage to the mortgagee bank.

In paragraph 11 of the stipulation, it was provided that Deborah Keniston would be entitled to the exclusive use of the parties' homestead "until such time as she shall marry, no longer reside at said home, or until the younger child shall attain the age of 18 years, sooner die or become emancipated". Paragraph 11 of the 1979 stipulation further provided that upon the occurrence of any of these events the homestead real estate shall be sold and the net proceeds would be divided equally between the parties. The youngest child reached 18 years of age in June of 1983 and under the terms of the original stipulation the debtor would have been relieved then of any further obligation on the second mortgage and Deborah Keniston would have been obligated to sell the house and divide the net proceeds equally with the debtor.

In December of 1981 however the parties executed an "Amendment to Stipulations" modifying their 1979 Permanent Stipulations.

The amendment came about because Deborah Keniston's parents wished to move in with her at the New Hampshire residence. However, this would require adding a wing to the house, which they would finance, but which they were unwilling to do as long as the debtor had a right to a sale of the house and one-half of the net proceeds when the youngest child reached 18 in 1983.

Deborah Keniston approached the debtor as to whether he would be willing to give up those rights to permit her parents to move in with her. At that time, he had kept current his monthly support obligations for the children and his payments on the second mortgage as required by the divorce stipulation.

The debtor agreed to this request without any objection even though it meant waiving his rights to approximately $30,000.00 for one-half of the net equity in the house when it was to be sold in 1983.[15]

The debtor testified that when he discussed the matter with Deborah Keniston it was agreed that "I would sign a quitclaim deed of the house to her and I'd waive all rights to the home." Deborah Keniston did not contradict this in her testimony and in fact corroborated the fact that her parents' projected move was the only cause for the requested change. I find the debtor's description of the meeting of the minds of the parties on the change credible. I also find that there was no discussion whatsoever by the debtor and Deborah Keniston of extending the debtor's obligation on the second mortgage beyond June of 1983. When pressed, Deborah Keniston also could give no reason as to why any change in the second mortgage obligation of debtor would be relevant to her request to the debtor to modify the 1979 stipulation.

Since the change would require amendment of the stipulation on file in the divorce court, it was left to the debtor to have his attorney draw up the necessary amendment. That attorney drew up the 1981 amendment which was executed on December 22, 1981 and provides as follows:

---

**15.** The house was actually sold in December of 1985 and Deborah Keniston realized a net equity of $60,000.00.

That as Wallace E. Keniston, Jr. is 18 and a high school graduate that the defendant's obligation and support for him has terminated. The defendant shall pay the sum of $25 a week for support of Kathleen M. Keniston until she is 18 years of age and also a high school graduate. At that time the defendant's obligation to support her shall terminate. That the defendant shall pay the second mortgage on the plaintiff's homestead until it is sold, at which time the mortgage shall be paid off.

That the defendant shall, if he has not already done so, Quitclaim his interest in the plaintiff's homestead to her subject to the mortgages thereon, thereby terminating his interest in said homestead property. Due to this conveyance paragraph eleven on the stipulation signed on October 18, 1979 shall be of no effect.

This written document clearly does *not* embody the "meeting of the minds" of the debtor and Deborah Keniston reached in their discussions on this matter.

Thus, a comparison of the debtor's situation under each of the two stipulations reveals that under the 1979 stipulation the debtor was obligated to pay the second mortgage on the homestead real estate only until such time as his former wife remarried, no longer resided in said home or until the younger of the parties' two children obtained the age of 18, died, or became emancipated. (Paragraphs 7 and 11 of Defendant's Ex. #1). Under the 1981 stipulation however, the debtor was obligated to pay the second mortgage on the homestead until it was sold (even if that was long after the parties' children reached age 18) while at the same time, by quitclaiming his interest in the homestead to his former wife and thereby terminating his interest therein, the debtor gave up his right to one-half of the equity when it was sold. (Paragraphs 2 and 3 of Defendant's Ex. #2.)

Following the parties' execution of the 1981 Amendment to Stipulations, the debtor did execute a quitclaim deed to his ex-wife and continued to pay the second mortgage on the subject real estate until February, 1984 even though the younger child of the parties reached age 18 in June of 1983.

The debtor testified that he believed his second mortgage obligation cut-off was still June of 1983 (not noting the indirect effect of the last sentence of paragraph 3 of the 1981 amendment) but voluntarily continued those payments until the younger child left the family home in September of 1983 and the older child left the home in February of 1984. I find that testimony credible and find that those continued payments by the debtor were not related to any understanding by him that the 1979 stipulation in that regard had been changed in any respect.

Because the debtor had ceased making the second mortgage payments in February, 1984, Deborah Keniston filed a motion for contempt against him in November of 1984, in the state court which had entered the divorce decree. During the course of a hearing on this motion on February 7, 1985, in the Carroll County Superior Court, the debtor represented to that court that he had the ability to pay the second mortgage payment of $155.00 per month and, in addition, to pay his former wife $200.00 per month on the arrearages in said second mortgage payments. The evidence establishes that the debtor was *aware* at the time of the hearing before the Carroll County Court that he had the option of filing a bankruptcy petition. The evidence also establishes that he had not formed the *intention* of filing bankruptcy at that time.

By order dated February 7, 1985 the Carroll County Superior Court found the debtor in contempt for having ceased making the payments on the second mortgage and ordered the debtor to continue with said payments and to repay the plaintiff for the arrearages at the rate of $200.00 per month. The debtor filed his chapter 7 bankruptcy petition with this court on February 22, 1985.

The February 7, 1985 order of the Carroll County court is a handwritten notation on a form by the presiding judge providing in its entirety as follows:

Plaintiff's Motion for Contempt is granted.

The defendant is in contempt of the court's orders as reflected in the Stipulation of October 18, 1979 as amended by the stipulation of December 22, 1981. The language of these stipulations is clear and unambiguous. Both were entered into by the defendant knowing their meaning and import and with the advice and consent of his counsel who drafted the second stipulation.

Accordingly, defendant is ordered to bring to date the second mortgage on plaintiffs property and to keep it to date. In addition he is ordered to repay the plaintiff $1,591.50 at the rate of $200.00 per month commencing March 15, 1985.

From the language of that order, and the description of the February 7, 1985 hearing given by the parties in the hearing before me, I conclude that the reference to the debtor's "knowing" the meaning of the 1981 amendment was based upon the fact that his attorney drafted the document and not upon any detailed testimony as to the actual agreement and understanding *of the parties* as has been presented to this court.

■ A bankruptcy court has the power to look behind the specific terms of a state court judgment, if it is necessary to "look through form of substance," as an equitable matter, as developed in a long series of case decisions following the forceful pronouncement of that power by the Supreme Court in *Pepper v. Litton*, 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). This power is used quite often in dealing with judgment of divorce courts as they affect bankruptcy proceedings. *See,* e.g., *In re Meadows,* 75 B.R. 695, 697 (Bankr.N.D.Tex.1987); *In re Winders,* 60 B.R. 746 (Bankr.N.D.Iowa 1986); *In re Ploski,* 44 B.R. 911 (Bankr.D.N.H.1984). *Cf. also, In re Butcher,* 74 B.R. 211, 216 (Bankr.E.D.Tenn.1987).

I find for present purposes, dealing with the § 707(b) issue, that the debtor did *not* understand that the 1981 amendment as drafted extended his obligation on the second mortgage, until that contention was brought to his attention by his exwife's motion for contempt in November of 1984. Any "knowing" on his part in that regard was only a legal fiction by virtue of the preparation of the document in question by his attorney. It should be emphasized here that my finding does not mean that the state court ruling was improper, or would be legally ineffective absent the bankruptcy filing. The sole question before this court is the question of the debtor's bad faith, i.e., substantial abuse under § 707(b) in his chapter 7 filing.

Turning to the specific applicability of § 707(b) in the present case, the debtor's petition and the record before me establish that as of the February 22, 1987 chapter 7 filing the debtor had the following outstanding debts: (1) a secured debt of $3,298.80 to Ford Motor Credit Company involving a pickup truck; (2) a secured debt of approximately $30,000.00 to the Wolfeboro National Bank on the first mortgage on the family home; (3) an unsecured disputed debt of $4,149.00 to Deborah Keniston's parents for prior loans; (4) and Deborah Keniston's claim that debtor was obligated for the entire $3,100.00 second mortgage balance in the event she did not sell the house before it was paid off.

For assets the debtor listed wearing apparel of $200.00; a lamp and bureau of $100.00; chimney cleaning equipment of $100.00; and approximately $700.00 in equity in the pickup truck. All these assets were allowed as exempt by the trustee's report on April 5, 1985. At the time of the bankruptcy filing the debtor was employed as a manager of a bowling alley and did chimney cleaning on the side. He earned approximately $12,000.00 a year from these endeavors.[16]

---

**16.** Much of the briefing of the parties on this matter deals with changes in the debtor's employment *after* the bankruptcy filing. While his leaving one job, not working awhile, and his ability to be a "kept man" by his new wife if he chose would make interesting reading, I do not believe it is material to the only question pending before this court, i.e., was his chapter 7 filing on February 22, 1985 a substantial abuse under the statute. Moreover, the undersigned judge is not a good enough writer to do it justice. A short story by O'Henry or a play by a modern Shakespeare would be more appropriate. *Cf. In re Keniston,* 60 B.R. 742, 744 (Bankr.

The debtor has suggested that his debts were not "primarily consumer debts" rendering § 707(b) inapplicable. While there may be some basis to that contention regarding the second mortgage obligation to Deborah Keniston under the divorce decree, it is unnecessary to decide that point here. The loan claim of the parents had to do with household expenses, and the Ford Motor claim likewise was a consumer debt obligation within the definitional provisions of §§ 101(4), 101(7), and 101(11) of the Code. Moreover, it has been expressly held that a first mortgage obligation on a family home, such as the Wolfeboro Bank obligation here, is a consumer debt under the plain language of those sections for § 707(b) purposes. *In re Kelly*, 841 F.2d 908, 911–13 (9th Cir.1988).

Applying § 707(b) to this case, there is no question that as of the date of bankruptcy filing the debtor was able from his future income, in his existing jobs, to pay his second mortgage obligation to his ex-wife at the rate of $155 a month, together with a $200 a month catch up on the $1,591.50 arrearage under the divorce court order, without undue hardship in the sense of having enough cash left monthly over living expenses to make those payments.[17] Under my construction of § 707(b) however that is not enough to justify dismissal. The record must be searched further to determine whether there are some additional "egregious circumstances" or some "unfair advantage" which would support a finding of substantial abuse.

On the one hand, we have the circumstance of the debtor's appearance before the state court being aware that he might file bankruptcy but stating only that he had the ability to pay the debt in question.

We also have the fact that at least one of his motives in the bankruptcy filing was to avoid what he considered an unfair obligation regarding the extension of the second mortgage obligation imposed upon him by his ex-wife and the divorce court.

On the other hand, we have the fact that the debtor could only repay that obligation "without undue hardship" if he were to remain in his bowling alley and chimney sweep occupations. He wanted to start a demolition business in his own name (but with some funding from his new wife) but did not want to do so if he would only be working to create assets that could be reached by his ex-wife and her parents.[18]

On balance, I conclude that there are not in fact any "additional factors" apart from the debtor's ability to repay his debt to his ex-wife out of future income sufficient to constitute a substantial abuse by this debtor in his chapter 7 filing. The record does not justify dismissal of the petition under § 707(b) of the Bankruptcy Code as herein construed. Accordingly, a separate order will be entered discharging my Order To Show Cause without dismissal and directing the Clerk to prepare an appropriate discharge order regarding this debtor.

---

D.N.H.1986). Likewise, I find irrelevant the circumstance that the debtor's new wife has substantial assets of her own. She *could* help the debtor with his debts but she can not be *compelled* to do so and he has no legal claim to those assets.

**17.** It is not clear that the debtor could have paid the parents' claim, or the first mortgagee bank, without undue hardship if that had become necessary. However, there is a question as to whether the parents' claim might be barred by the statute of limitations (which this record does not resolve) and the family home apparently had enough equity to cover the first mortgage obligation. In any event, I assume for present purposes that the requisite ability to repay (under those cases holding that to be the key § 707(b) factor) has been shown.

**18.** I am aware that the new business could have been organized in his new wife's name but my impression of Mr. Keniston is that he just didn't think that way. It was important to him *not* to be considered a "kept man" and such a device was not palatable.